EXHIBIT D

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990

# Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products

Just like tech companies that have struggled to tackle misinformation on their platforms, Amazon has proven unable or unwilling to effectively police third-party sellers on its site

By Alexandra Berzon [Follow] , Shane Shifflett [Follow] and Justin Scheck [Follow]

Aug. 23, 2019 8:56 am ET

Many of the millions of people who shop on Amazon.com see it as if it were an American big-box store, a retailer with goods deemed safe enough for customers.

In practice, Amazon has increasingly evolved like a flea market. It exercises limited oversight over items listed by millions of third-party sellers, many of them anonymous, many in China, some offering scant information.

A Wall Street Journal investigation found 4,152 items for sale on Amazon.com Inc.'s site that have been declared unsafe by federal agencies, are deceptively labeled or are banned by federal regulators—items that big-box retailers' policies would bar from their shelves. Among those items, at least 2,000 listings for toys and medications lacked warnings about health risks to children.

The Journal identified at least 157 items for sale that Amazon had said it banned, including sleeping mats the Food and Drug Administration warns can suffocate infants. The Journal commissioned tests of 10 children's products it bought on Amazon, many promoted as "Amazon's Choice." Four failed tests based on federal safety standards, according to the testing company, including one with lead levels that exceeded federal limits.

Of the 4,152 products the Journal identified, 46% were listed as shipping from Amazon warehouses.

After the Journal brought the listings to Amazon's attention, 57% of the 4,152 listings had their wording altered or were taken down. Amazon said that it reviewed and addressed the listings the Journal provided and that company policies require all products to comply with laws and regulations.

"Safety is a top priority at Amazon," says a spokeswoman. Amazon uses automated tools that scan hundreds of millions of items every few minutes to screen would-be sellers and block suspicious ones from registering and listing items, using the tools to block three billion items in 2018, she says.

"When a concern arises," she says, "we move quickly to protect customers and work directly with sellers, brands, and government agencies."

Amazon declined to make executives available for interviews.

Christy Stokes blames her son's death on a fraudulently labeled helmet bought on Amazon. Albert Stokes trusted Amazon's quality control, she says, when he picked a motorcycle helmet with an Atlanta Falcons logo for his girlfriend to buy for his 23rd birthday in 2014. It was listed on Amazon as certified by the U.S. Transportation Department.

On June 3, 2014, Mr. Stokes was riding his red Kawasaki in rural Missouri when a Ford Ranger pulled out. He crashed into it, and his helmet came off. A friend phoned his mother to alert her. "When I came up over the hill on the interstate," she says, "there was my son laid out on the highway."

Albert Stokes's helmet, bought on Amazon, and his bike before he was killed in a 2014 accident. PHOTO: STOKES FAMILY

The coroner declared Mr. Stokes dead at the scene, a day before he and his girlfriend planned to find out their unborn baby's gender. His mother sued Amazon, claiming the helmet was flawed. Amazon in court argued it didn't sell the helmet but merely listed it on the seller's behalf. It settled for $5,000 without admitting liability. It declined to comment on the case.

The National Highway Traffic Safety Administration said last month that the helmet wasn't DOT compliant and that it had been recalled. It was still listed, and as DOT compliant, last month until the Journal inquired about it, after which Amazon took it down.

Within two weeks of Amazon's removing or altering the first problematic listings the Journal identified, at least 130 items with the same policy violations reappeared, some sold by the same vendors previously identified by the Journal under different listings. Amazon said it

5/6/23, 5:15 PM                    Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products - WSJ

Case 2:23-cv-01975-JHC   Document 25-5   Filed 05/10/23   Page 4 of 15

then "removed these items and refined our tools to prevent them from being offered in our store."

"There are bad actors that attempt to evade our systems," Amazon said of products in violation of its policies that appear on the site, adding that "should one ever slip through, we work quickly to take action on the seller and protect customers."

Amazon's struggle to police its site adds to the mounting evidence that America's tech giants have lost control of their massive platforms—or decline to control them. This is emerging as among the companies' biggest challenges.

Amazon, Facebook Inc., Twitter Inc., Alphabet Inc.'s YouTube and others are under scrutiny over how they wield their dominance in booming internet markets while their forums are used for fraudulent listings, offensive content and misinformation—including some spread during America's 2016 elections.

**Top Shop**
Share of online retail, 2018

Source: eMarketer

Some lawmakers have begun calling for more regulation of the companies. Courts have begun challenging the firms' interpretation of their legal protections, and regulators are scrutinizing them. Tech companies say they aren't illegal monopolies and have generally pledged to address issues such as misinformation and privacy.

Amazon's legal defense in safety disputes over third-party sales is that it is not the seller and so can't be responsible under state statutes that let consumers sue retailers. Amazon also says that, as a provider of an online forum, it is protected by the law—Section 230 of the Communications Decency Act of 1996—that shields internet platforms from liability for what others post there.

This is similar to a common stance taken by internet companies faced with complaints about content or services offered on their platforms. Courts and regulators have largely agreed—until recently.

Last month, the U.S. Court of Appeals for the Third Circuit held that a Pennsylvania customer could sue Amazon over an allegedly unsafe product. The court said Amazon could be

considered a seller under Pennsylvania law, in part because the company had no vetting process to ensure that third-party sellers were accessible and available for consumers to sue if they were harmed by an item, leaving consumers with no recourse in many cases. The court also held Amazon had considerable control over third-party sellers and could prevent sales of unsafe items. Amazon has asked the appeals court to review the decision.

Last year, the Environmental Protection Agency fined Amazon for letting people sell unregistered pesticides. Amazon agreed, without admitting wrongdoing, to pay a fine and set up new systems to stop such sales. Earlier this year, Washington state's attorney general and Amazon filed a settlement in state court over state allegations that the company allowed school products on the platform that contained lead and cadmium above federal and state limits. Amazon didn't admit wrongdoing.

Amazon tells customers, on its payments site: "We want you to buy with confidence anytime you make a purchase on the Amazon.com website."

On its site aimed at third-party sellers, it says customers "know and trust us, and that trust extends to you."

**Outside the Box**
Share of physical gross merchandise sales on Amazon by third-party sellers

Source: the company

Third-party sellers are crucial to Amazon because their sales have exploded—to nearly 60% of physical merchandise sales in 2018 from 30% a decade ago, Amazon says. The site had 2.5 million merchants with items for sale at the end of 2018, estimates e-commerce-intelligence firm Marketplace Pulse.

Amazon doesn't make it easy for customers to see that many products aren't sold by the company. Many third-party items the Journal examined were listed as Amazon Prime eligible and sold through the Fulfillment by Amazon program, which generally ships items from Amazon warehouses in Amazon-branded boxes. The actual seller's name appeared only in small print on the listing page.

Customers "could end up in the part of the product pool where who knows where this came from," says Bill Pease, a chief scientist at safety-labeling company UL LLC, who is working

with large retailers on setting up new product-safety systems. "And most people don't know that."

**Primary Source**
Amazon Prime members world-wide

Amazon's overriding corporate philosophy of offering ever more options is clashing with internal efforts to make sure product listings won't harm buyers, the Journal found in interviews with former employees and others close to Amazon's safety practices, and from internal records.

The Amazon spokeswoman says: "Our mission is to be Earth's most customer-centric company. We strive for that goal by building the best shopping experience for customers, with unbeatable prices, selection and convenience—but not at the expense of our customers' safety and this insinuation is simply wrong."

To test the effectiveness of Amazon's safety practices, the Journal analyzed listings on Amazon between May and early August, and hired a federally certified testing company to examine certain items bought on Amazon. Among the findings:

•116 products were falsely listed as "FDA-approved" including four toys—the agency doesn't approve toys—and 98 eyelash-growth serums that never undertook the drug-approval process to be marketed as approved.

•43 listings for oral benzocaine, a pain reliever, lacked advised FDA labels warning against use on children under 2.

•80 listings matched the description of infant sleeping wedges the FDA has warned can cause suffocation and Amazon has said it banned.

•52 listings were marketed as supplements with brand names the FDA and Justice Department have identified as containing illegally imported prescription drugs.

•1,412 electronics listings falsely claimed to be UL certified—indicating they met voluntary industry safety standards—or didn't provide enough information to verify the claim.

•The Journal analyzed 3,644 toy listings for federally required choking-hazard warnings. Regulators don't provide databases of toys requiring the warning, so the Journal compared

the Amazon listings with the same toys on Target.com and found that 2,324, or 64%, of the Amazon listings lacked the warnings found on the Target listings.

•In addition to the 4,152 items, the Journal initially found 4,510 balloons lacking required choking-hazard warnings listed.

U.S. Public Interest Research Group, a consumer-advocacy organization, in 2018 reported that a large portion of Amazon balloon listings lacked the warning. That Amazon hasn't fixed the problem "shows that Amazon has decided not to put safeguards in place to ensure that kids are protected from one of the largest choking hazards from toys," says Adam Garber, who co-wrote the report. "You can't tell me they can't come up with a system to require companies to include the necessary hazard labels based on what they're selling."

Warnings were added to most listings and a small number were removed after the Journal sent Amazon a list of balloon listings that didn't include the correct language.

Weeks later, the Journal identified an additional 2,208 balloon listings without choking hazard warnings; those, too, now have appropriate warnings or were taken down. Amazon declined to comment on the balloons.

Including the balloons, 83% of the 10,870 total listings the Journal presented to Amazon were taken down or altered. Amazon didn't alter the UL listings. The Amazon spokeswoman says electronics are often rebranded by multiple different sellers that may not be searchable in UL's database.

The Journal's analysis didn't include safety risks of counterfeit products, which some consumers have reported receiving through Amazon. Items disguised as name brands may contain dangerous materials or lack proper warning labels. Amazon says it "strictly prohibits counterfeit goods."

Dozens of products the Journal identified as dangerous or mislabeled had the Amazon's Choice designation, which many consumers take to be Amazon's endorsement. The company's website says Amazon's Choice reflects a combination of ratings, pricing and shipping time.

One was the toy musical-instrument set Darice Taipalus bought her son in March when he was 16 months old, she says. The Texas database developer says she assumed everything on Amazon met safety standards, until the Journal contacted her.

The Amazon listing said the set was "made of high quality nontoxic material, safe and reliable for little children" and claimed approval from the FDA. Journal-commissioned testing showed the set's xylophone contained nearly four times the lead the federal government allows in children's products. According to the testing company, the set also failed tests based on federal requirements for determining sharp points.

"He's a toddler," Ms. Taipalus says. "Everything goes in his mouth." She says she threw the set away after hearing the Journal's testing results.



'Everything goes in his mouth.' Tests showed elevated lead levels in a xylophone in a toy set like one Darice Taipalus bought on Amazon for her son, Parker, here at home this month. PHOTO: COOPER NEILL FOR THE WALL STREET JOURNAL

Amazon initially didn't take the product down after the Journal informed it of the test results, saying a Chinese entity that goes by the name Ailuki had previously provided a test report showing there were no detectable lead levels. It subsequently took the set down in the U.S. and says it is asking Ailuki for more documentation.

Ailuki sent the Journal a test report it said it had commissioned that stated there were no detectable lead levels. It didn't respond to further requests for comment.

Another musical-instrument set failing the Journal's tests, made by a company calling itself Innocheer and listed as in China, likely contributed to a New York City child's lead poisoning, according to city health officials. The city in May 2018 began tracking down contaminated products including the set bought on Amazon, a New York health-department spokesman says.

Subsequent testing showed the set's bright-yellow maracas contained 411 times the lead legally allowed, health-department documents show. After a federal recall last fall, Amazon

pulled the listing and notified customers of the recall, the company says. "We execute recalls as soon as we are aware of them," it says.

The set later appeared online with red maracas, stating the instruments were lead-free. In the Journal-commissioned tests, conducted after the recall, the maracas didn't contain lead but other instruments in the set failed sharp-point tests. Innocheer couldn't be reached for comment. Amazon has taken the set down in the U.S., saying it is requesting additional compliance documentation.

In its early days, Amazon operated a lot like big-box stores, largely in direct control of its supply and distribution chains. Customers got products directly from Amazon or a known retail partner such as Toys "R" Us. In 2001, third-party sellers made up 6% of Amazon's physical merchandise sales, company data show.

The same year, the company articulated a core philosophy that helped spur the growth of third-party sellers. According to published company histories, founder Jeff Bezos and other officials scribbled an image of a "virtuous cycle": It depicted how third-party vendors would want to sell to Amazon's customers and would add more products at less expensive prices, attracting even more customers and more sellers.

As smaller retailers joined Amazon's marketplace, the company seemed unprepared to police them, some former employees say. In 2011, a team of three oversaw safety for the entire site, which essentially consisted of managing recalled products, say some of them, including Rachel Johnson Greer, a former employee who managed Amazon's safety systems until 2015 and now advises third-party Amazon sellers.

The main enforcement effort on product safety was rudimentary and involved running an Excel spreadsheet script to identify products recalled by the consumer-safety commission and manually then remove them, Ms. Greer and the other former employees say.

Many risky products got through, and the third-party marketplace became "a giant disaster zone," says Ms. Greer. "It was absolutely insane." Ms. Greer says she worked initially with an engineer and legal intern to develop a machine-learning tool to automatically take down restricted products. It scanned third-party-item descriptions for certain keywords, growing smarter as the team refined what to target, she says.

5/6/23, 5:15 PM  Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products. - WSJ

Case 2:23-cv-01975-JHC   Document 25-5   Filed 05/10/23   Page 10 of 15

The safety team grew rapidly alongside the artificial-intelligence tool, with hundreds of people across several departments and countries. But product volume was growing, and many products continued to slip through, she and other former employees say.

At one point in 2013, some Amazon employees began scanning randomly selected third-party products in Amazon warehouses for lead content, say people familiar with the tests. Around 10% of the products tested failed, one says. The failed products were purged, but higher-level employees decided not to expand the testing, fearing it would be unmanageable if applied to the entire marketplace, the people familiar with the tests say. Amazon declined to comment on the episode.

**Bull Market**
Amazon sales

Source: FactSet

"Amazon will always default to allowing more stuff to be available to the customer," says Ms. Greer. In 2017, she ordered baby products, children's toys and food-related products from Amazon that came up high in search results but had false certification claims, such as claiming FDA approval, and sent them to federally certified laboratories for testing. She says that, at the time, she estimated 80% of Amazon's third-party sellers didn't comply with federal, state or industry safety and labeling standards and that the vast majority of the issues were not having proper warnings and labels.

The Amazon spokeswoman calls Ms. Greer's analysis "wrong and baseless" and says Amazon doesn't sacrifice product safety in favor of selection. Ms. Greer says she stands by her analysis.

Amazon doesn't do its own testing for product safety, according to documents the company filed in the Washington-state case. It does sometimes randomly buy certain high-end jewelry and send it out for testing to make sure third-party sellers aren't peddling fake jewels, according to its publicly posted procedures. The Amazon spokeswoman says the jewelry spot tests are one of various programs the company does to "ensure customers receive the compliant products they expect."

Amazon openly encourages anyone to sign up and start selling right away unless something in their registration or initial posting triggers the automated tools to flag them for more vetting.

In contrast, Walmart Inc. requires all products on store shelves be tested at approved labs, company documents show. Target says it requires suppliers of store-branded products to undergo additional inspections and testing beyond government standards.

Target and Walmart have created online marketplaces for third parties to sell directly to consumers. Target's site, launched earlier this year with several sellers, is invitation-only. Walmart had around 22,000 sellers at the end of 2018, according to Marketplace Pulse. It requires an application that can take days for approval, and only a fraction of merchants applying make it through the vetting, says a person familiar with Walmart's policy.

The Journal didn't analyze products sold on Walmart and Target shelves or websites.

A persistent problem for Amazon has been magnetic toys. Amazon and other big retailers banned sets of high-powered magnetic balls and cubes in 2012 after reports of thousands of children ending up hospitalized for swallowing them. Inside the body, the magnets can snap together and rupture abdominal tissue. The Consumer Product Safety Commission, or CPSC, has called them a "substantial product hazard." Retailers still selling them generally allow them on store shelves only when marketed for adults.

Amazon's policy said it prohibited "Products that include large quantities of magnetic balls or cubes, such as:" then listed eight brands. But knockoffs of the toys slipped through. The Journal found nearly 80 that appeared to match listings of the banned toys. About 40 of these listings were removed after the Journal contacted Amazon. Roughly 30 still remain that appear to match descriptions of prohibited products originally described on Amazon's compliance pages.

Danny Puskarcik, who worked in product compliance at Amazon until early this year, says the magnets issue "was an extremely high priority," seen as so serious that employees sought to enforce the policy very broadly. "The idea was to catch all powerful magnets," he says. "Get rid of them. Destroy them."

Creed Cameron, an Amazon manager for restricted products until 2017 and no longer at the company, says his team never found a good way to handle the magnet problem. Taking down the cheap, mass-manufactured products, he says, was "like trying to stop a bullet."

After the Journal contacted Amazon about the knockoffs, the spokeswoman said that despite the wording of the policy—and the experiences described by the two former workers—the

company intended to ban only the specific magnet-toy brands listed. Other magnet toys, including ones identical to the banned toys but sold under different names, were supposed to be allowed on the site, she said.

Amazon then changed the wording of the policy to ban the specific brands. The spokeswoman declined to comment on why Amazon has banned some brands but not others.

Amazon's policy of banning only some brand-name products "makes no sense," says Alan Schoem, a lawyer who has represented one of the banned brands and is a former CPSC official. "You'd think they'd want to be a little more careful."

When Amazon does take down listings for banned items, the same products sometimes reappear under new accounts, the Journal found.

The EPA has announced a ban starting in November on consumer products containing methylene chloride, which the agency has linked to cancer and sudden death from toxic fumes. Amazon late last year said it would purge paint strippers using the chemical by March, but there were still dozens of them for sale then. When an advocacy group named Safer Chemicals, Healthy Families identified the products, Amazon took them down.

More such paint strippers popped up and were removed only after the group flagged them. "They clearly need to do a better job of setting up a system to police their supply chain," says Mike Schade, a campaign director for the nonprofit. Amazon declined to comment on the paint strippers.

Neither Amazon nor federal regulators have made public attempts to measure the scale of the site's safety issues, but at least one state has done so for one product category. This year, the Washington state attorney general's office examined school supplies and found 35 out of 41 Amazon products tested contained amounts of cadmium, lead or both above federal or state limits, state documents show.

Discount stores that the state studied also had a similar ratio of problem products, while other retailers in the test didn't, says Kelly Wood, one of the state attorneys involved in the case.

After the state notified Amazon, the company conducted tests in a warehouse and found that four of 45 tested items had hazardous levels of lead or cadmium, including a unicorn necklace whose pendant-backing makeup was 35% cadmium, more than 8,500 times the legal limit in Washington, state documents show.

Washington state asked Amazon to provide documentation for the children's products showing they had passed safety tests outlined in the company's internal policies. Amazon told the state the company may request certificates for certain high-risk products, and that any seller is required to provide them when asked, but that it didn't have any for the products identified by the state.

Even after Amazon, prompted by the state, went to retailers and asked them directly for the compliance documents and certifications, it didn't receive documents back, the company said, according to documents obtained by the state.

"They weren't really checking that these products were tested prior to putting them up on their website," says Mr. Wood.

The Amazon spokeswoman says the company "worked with our selling partners to verify that the school supplies and children's jewelry in our store are safe and enhanced our processes to verify the safety of these products moving forward. We welcome ongoing collaboration with the Attorney General and other agencies to promote customer safety."

Amazon customers the Journal contacted who bought products that didn't meet safety standards say they had assumed they were buying from Amazon directly or that everything on the website passed safety standards.

That includes Ms. Stokes, whose son died in the motorcycle accident wearing a helmet falsely claiming DOT compliance. She sued Amazon, the Ford Ranger driver and Ivolution, the Corona, Calif., company that sold the helmet, in Missouri state court, alleging that the truck driver was at fault for the accident and that the helmet had a faulty strap. The driver settled. The case against Amazon and Ivolution was moved to federal court in the Western District of Missouri.

Ivolution owner Ricky Zhang in court statements said another man had bought 103 helmets from him and sold them on Amazon and that Ms. Stokes didn't prove the accident was related to the helmet. His company bought products from China to resell on Amazon, according to the legal documents. It was so small he couldn't afford legal representation, he said in court.

5/6/23, 5:15 PM
Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products - WSJ

Case 2:23-cv-01975-JHC Document 25-5 Filed 05/10/23 Page 14 of 15



'When I came up over the hill on the interstate, there was my son laid out on the highway,' says Christy Stokes, here at his roadside memorial. PHOTO: WHITNEY CURTIS FOR THE WALL STREET JOURNAL

The judge ordered Ivolution to pay $1.9 million to Mr. Stokes's family, which says the company hasn't done so. Mr. Zhang didn't respond to requests for comment.

Amazon attorney Monte Clithero says the company, which settled the case for $5,000, denies any responsibility. "Basically, a third party was using Amazon as a bulletin board to advertise the product and sell."

On July 1, 2019, the National Highway Traffic Safety Administration said Ivolution had recalled the helmet—it said 4,071 were on the market or sold. An agency test in April 2018 had found the helmet cracked open on contact.

On July 29, the helmet model and eight other helmets that failed federal safety tests in 2018 were still listed for sale on Amazon. Amazon removed them after the Journal pointed them out.

A week later, the Journal found a listing for the helmet model Mr. Stokes wore was listed on Amazon by a different vendor, labeled as out of stock. There were also listings for four other helmets Amazon had taken down after the Journal notified it that the products had failed federal safety tests.

Amazon then took those down.

*—Lisa Schwartz and Fanfan Wang contributed to this article.*

*—Additional design and development by Angela Calderon, Joel Eastwood, Jessica Kuronen, and Allison Pasek*

5/6/23, 5:15 PM  Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products. - WSJ

Case 2:23-cv-01975-JHC   Document 25-5   Filed 05/10/23   Page 15 of 15

**Write to** Alexandra Berzon at alexandra.berzon@wsj.com and Justin Scheck at justin.scheck@wsj.com

*Appeared in the August 24, 2019, print edition.*